At December Term, 1851, the following opinion was delivered by
In 1826 John Riddick died intestate, seized of lands in Gates County, and leaving three daughters, Emily, Sarah, and Mary, *Page 171 
who were his heirs at law. Emily married Thomas B. Hunter, and Sarah married William Ely, and they and the said Mary, then an infant, united in a petition in the court of equity for partition of the land by having it sold, which was accordingly decreed, and the sum of $2,400 received therefor. Before the money was paid, Mrs. Hunter died, leaving her husband surviving and also their two infant children, Thomas and Sarah Ann, and their father, Thomas B. Hunter, was appointed their guardian, and then received one-third part of said sum. Afterwards, Mrs. Ely died intestate and without issue, and Mr. (266) Hunter received one-half of her share of the money for the share thereof of his children, representing their mother as one of Mrs. Ely's heirs. Subsequently, Thomas Hunter died intestate and an infant, leaving his sister, Sarah Ann, his sole heir; and then, in 1835, Thomas B. Hunter, the father, died also, leaving a considerable personal estate to his daughter, Sarah Ann. Thomas Twine was afterwards appointed the guardian of Sarah Ann and received from the administrator of her father all the sums he had held as part of the proceeds of the land, and also the personalty to which she succeeded as the next of kin of her father.
Thomas B. Costen, a brother of the wife of the before named John Riddick, died intestate and without issue and seized of lands in fee, and leaving as his heirs two brothers, James and George, and Mary Riddick aforesaid and Sarah Ann Hunter, the two last representing Mrs. Riddick, the deceased sister of the intestate, Thomas R. Mary intermarried with George W. B. Satterfield, the plaintiff, and Twine having removed from the State the plaintiff was appointed the guardian of Sarah Ann. Upon the petition of James Costen, George Costen, Satterfield and wife, and Sarah Ann, those lands were also sold by decree of the court of equity, and the share of the proceeds belonging to Sarah Ann was $975.16, after deducting the expenses; and the plaintiff as her guardian received the same. Before any settlement was made by the plaintiff with Twine, the former guardian, Sarah Ann and Willis F. Riddick, contemplating an intermarriage, entered into articles on 9 September, 1847, in which it was recited that she was in possession of and entitled to a considerable personal estate, consisting principally of money in the hands of her two guardians, Thomas Twine and George W. B. Satterfield, and also that she was entitled to a portion of the estates of Mary Goodman, deceased, as an heir, devisee, (267) legatee, or next of kin of said Mary, and further that it had been agreed between them that he, Willis F. Riddick, should not receive or enjoy any portion of the property then in the hands of either of the said guardians or in possession of the said Sarah Ann, or any portion of the estate of Mary Goodman, deceased, to which she might be *Page 172 
entitled, but that the same should be settled as therein provided; and then the articles contain an assignment and conveyance from Sarah Ann to Isaac R. Hunter of all the said money and personal property in the hands or possession of Twine and Satterfield, and each of them, and of the share of Goodman's estate to which she might be entitled as aforesaid upon trust for Sarah Ann until the marriage, and then for her sole and separate use during the coverture, with power to invest and pay the profits to her alone; and upon the further trusts if she should survive her intended husband to convey and transfer the whole to her immediately, but in case he should survive her, then in trust for the husband and such child or children as she might leave, equally to be divided between them; and if she should leave no child, then for such person or persons as she might, by any writing in the nature of a will, appoint, and for want of such appointment to the husband absolutely.
The marriage took effect, and in about a year the parties had issue, a son, who lived only a few days, and then Sarah Ann died in infancy and without any other issue and without making any appointment of the property. Soon after the marriage Isaac R. Hunter, the trustee, instituted a suit in the Court of Chancery of Virginia against Twine, the first guardian, and got a decree for the whole fund in his hands, consisting as well of the principal money arising from the sale of the land descended from John Riddick as the profits thereof and the money and other personal estate to which Sarah Ann was entitled from (268) her father; and after the death of Sarah Ann the whole was received and paid over to the husband, Willis F. Riddick, as his own.
Lassiter Riddick then took administration of the estate of Sarah Ann and instituted an action at law against Satterfield and his surety on the bond given by him as her guardian, and recovered therein $1,676.23, whereof $975.16 was the principal money received for the Costen land, and the residue for the interest accrued thereon in his hands.
The bill is filed by George W. B. Satterfield and George Costen, who is the surety in Satterfield's guardian bond, against Willis F. Riddick, the husband, and against the trustee in the marriage articles and the administrator of Mrs. Riddick. It states further that the plaintiff Satterfield and his wife, Mary, after she came of full age duly assigned and conveyed to one Hoskins all that portion of the money arising from the sale of the lands to which the said Mary was entitled as one of the heirs of her father, John Riddick, deceased, she having been privily examined thereto, and that Hoskins afterwards assigned the same to the plaintiff Satterfield. It states further that after the sales of all the lands and the death of Sarah Ann Riddick the plaintiff Satterfield and his wife duly assigned and conveyed to one Hudgins all that portion of *Page 173 
the fund arising from the sales of the Costen land, to which she was entitled as one of the heirs of Thomas R. Costen, deceased, and also any and every other interest which she, the said Mary, had in any other funds or estates whatever, she having been also privily examined thereto, and that Hudgins afterwards assigned the same to the plaintiff Satterfield.
The prayer is that the principal money arising from the sales of the land of John Riddick, deceased, belonging to Sarah Ann and received from Twine, may be decreed to the plaintiff Satterfield as belonging to him, and also that he may be declared to be entitled to the principal money, namely, the sum of $975.16, now in his hands arising from the sales of the Costen lands and once belonging to the said (269) Sarah Ann, and that the defendant be restrained from raising the same upon the judgment at law obtained on the guardian bond by Lassiter Riddick, administrator, as relator, and for general relief.
The answers are silent as to the assignment and conveyance from Satterfield and wife to Hoskins and Hudgins, and from them to Satterfield. They insist on the marriage articles as an effectual disposition of the interests and funds in controversy, and that they are thereby vested in the surviving husband.
The injunction was granted as prayed for, and on the coming in of the answers there was no motion to dissolve it, but the cause was set down and transferred to this Court for hearing.
It was not disputed at the bar that these funds, being the produce of land sold for partition, though they were in the hands of the infant's guardians in the form of money, were yet to be regarded in the court of equity as land, in respect to alienation, devise, or descent. As the owner died in infancy she could make no election to take the funds as money, and, therefore, the question is whether she made a valid disposition of them as land. That was the point principally debated by the counsel, though it was further insisted for the defendant that Mrs. Satterfield was a necessary party.
Upon the question whether an infant female may settle her real estate on marriage opinions seem to have much fluctuated in England. The prevailing ground for upholding such dispositions is the reasonableness of providing for the issue against the imprudence or misfortunes of the parents and protecting the feme in the beginning against the solicitations of the husband to join him in alienations. On the other hand, the common law denies the capacity to an infant to execute a conveyance of land, which cannot be avoided, and the doctrine (270) that such a conveyance is valid is exclusively that of equity. The difficulty is how the infant acquires an equitable capacity when she is under a legal incapacity. At the present day it seems to be altogether uncertain *Page 174 
what the rule in equity is on this point. The text-writers take opposite sides and great chancellors have differed, though in more modern times equity seems to be leaning to the law. Milner v. Harewood, 18 Ves., 275;Shaw v. Boyd, 5 Sarg. and Rawl, and 2 Kent Com., 243. Indeed, the reasons for upholding such settlements do not seem to be as strong in this country as in England. Marriage settlements are more rare in this country, and there seems to be a prevalent sentiment that, on the whole, they do not promote domestic harmony, and that the children are sufficiently and, perhaps, better protected by the law regulating the rights of husband and wife in their own and each other's property and the equal succession of all the children to the estates, both real and personal, of the parents. The Court may well pause, therefore, before laying down a definite rule on a point on which so much doubt seems to be entertained by others until it shall come directly and unavoidably into judgment. It does not arise at present, because the cause is not ripe for a decision, and because, if it were, it might be decided on another point not involving the general question and supposing an infant female capable of settling her land or binding it by marriage articles.
The point alluded to arises upon the particular terms of the articles entered into by these persons. The instrument states that the feme was, or might be, entitled to some estate as an heir of Mrs. Goodman, which must have been real estate, and that interest is undoubtedly the subject of the articles. But her other interests are described as personal estate, consisting principally of money in the hands of her guardians, and then in order to carry out an agreement that the intended husband (271) should be excluded from the receipt and enjoyment of the money, the articles assign those funds as "money and personal property," upon certain trusts agreed on. There is no doubt, therefore, that the parties thought this money to be personalty to all intents and purposes, and the articles plainly disposed of it as personalty. In that there was a total mistake. The inquiry, then, presents itself — admitting, even, that her disposition by the articles of the land, as such, would have been binding — whether the Court can regard this as an effectual, equitable disposition of this fund, being land, when the parties thought they were dealing for a purely personal interest, as they declare in the instrument, and as they most certainly did think.
It is not seen at present how the affirmative can be maintained. The difference consists in this. An infant female may unquestionably settle her personalty at marriage. That has been long settled in England on the ground that it cannot be to her prejudice, but must be to her advantage if it secure to her or her issue anything, since, without the settlement, the whole would go to her husband absolutely on her marriage. It may, indeed, be regarded as a settlement by the husband operating *Page 175 
by way of estoppel. For these reasons the Court held in Freeman v.Cooke, 41 N.C. 373, that a marriage settlement of slaves by an infant female was binding on all the parties and on the husband's creditors. Hence, the reasons of this lady for including this interest in the articles may have been — and, looking at it as money, her reasons must have been — that but for a marriage contract the husband would sweep all, and nothing would be left for her or her issue. But non constat had she known the source from which the money was derived and the real character impressed on it that she would have included it in this arrangement and would not have preferred the interest secured by law to herself, her issue, and her other heirs, leaving in the husband at (272) most, in case he should survive her, the profits for life — being far less than he got under the agreement. There seems, therefore, to be a strong reason why a court of equity cannot hold this lady's heirs to the specific performance of a contract so unequal and entered into under a clear mistake as to the nature of this property and the operation of the marriage on the rights to it. But this point was not spoken to in the argument, and the Court is quite willing it should be, as well as the other question, if either party so desire, before coming to a decision of the cause, especially as it is not now in a condition for a decree on the merits in favor of either party. The plaintiff has not shown himself entitled to the rights of the heir of Sarah Ann Riddick, if the heir have any rights. The bill states that by certain assignments — she being the heir — the rights of Mrs. Satterfield became vested in the plaintiff Satterfield exclusively, and the terms of one of the assignments, as stated, are perhaps broad enough to cover those rights. But those assignments are not admitted in the answers, nor otherwise established, and in that state of the case Mrs. Satterfield ought to be before the Court. The equity of the husband and wife together is only that the rights of the parties should be declared, and that the capital sums produced by the land, whether in the hands of one of the parties or the other, should be brought in and invested under the direction of the Court for the benefit of all concerned, giving the interest during his life to the surviving husband as tenant by the curtesy and securing the capital for the reversioner, Mrs. Satterfield, or her assignee in law or in deed. As husband merely or as the defendant in the judgment at law, the plaintiff cannot maintain the bill. But as it may have been an oversight merely not to exhibit his deeds, or, if there be none, not to have made his wife a party, and as it is better for all parties to have an early determination on the merits, it seems best that the cause should stand over that (273) the plaintiff may bring in his assignments or make his wife a party as he may be advised. When the cause shall be brought on again each party will be at liberty to insist on any equity to which he may suppose himself entitled. *Page 176 
And at June Term, 1852, the following additional opinion was delivered by